1
2
3
4
5
6
7

8      ## UNITED STATES DISTRICT COURT

9      ## CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  **RyMed Technologies, Inc.,** | Case No. 8:07-CV-1199 MRP (VBKx) |
| 12              Plaintiff, | **ORDER GRANTING ICU MEDICAL,** |
| 13      v. | **INC.'S MOTION FOR PARTIAL** |
|     **ICU Medical, Inc.,** | **SUMMARY JUDGMENT** |
| 14 | |
|     14              Defendant. | |
| 15 | |

16

17     **I. Background**

18          A. Procedural History

19          ICU Medical, Inc. ("ICU") brought suit against Rymed Technologies, Inc.

20     ("Rymed") for patent infringement in the District of Delaware on July 27, 2007.

21     Rymed then filed this suit in the Central District of California on October 10, 2007

22     for declaratory judgment of non-infringement and patent invalidity, together with

23     state and federal trademark and related claims.[1]  The patent claims were transferred

24

25     _____

26     [1] Rymed's claims include federal claims under the Lanham Act: trademark
       infringement (15 U.S.C. § 1114), false designation of origin, and unfair

27     competition (§ 1125(a)); claims under California law: unfair competition (Cal.
       Bus. & Prof. Code §§ 17200, 17500); common law passing off and unfair

28     competition; intentional interference with contract; and intentional interference

                                        -1-

1  to the District of Delaware May 21, 2008. ICU filed in this Court a Motion for

2  Partial Summary Judgment of the "Neutral" False Advertising and Trademark

3  Claims.[2]

4      B. Needleless connectors

5      Since the early 1990s, intravenous catheters have almost exclusively

6  employed needleless connectors because they obviate many problems associated

7  with accidental needle stick injuries. When the original needleless intravenous

8  (I.V.) connectors were disconnected, they caused a "negative fluid displacement,"

9  or reflux of the patient's blood within the catheter fluid pathway. If this blood

10  remained into the catheter, it would likely clot and block fluid flow, resulting in an

11  inability to draw blood or infuse medication to the patient, and the risk of catheter-

12  related bloodstream infection.

13      In the late 1990s, "positive fluid displacement" I.V. connectors were

14  developed, which were designed to push fluid out of the catheter upon

15  disconnection. However, upon connection, they caused negative fluid

16  displacement, drew patient blood into the catheter, and were likely to cause the

17  resulting issues associated with blood reflux.

18      In 2004, Rymed sought to alleviate the problems associated with negative

19  fluid flow with the InVision-Plus needleless connector, which was characterized by

20  Rymed as the first needleless connector with "zero fluid displacement." Decl. of

21  Dana Wm. Ryan in Opp. to ICU Medical's Mot. for Partial Summ. J. ("Ryan

22  Decl.") at 5-6.

23

24

25

26  with prospective business and economic advantages. Counts 1-9, Rymed's First

27  Am. Compl. for Injunctive Relief at 14-23.

28  [2] These claims include Counts 1, 2, 4, and 5 in their entirety, Counts 3, 6, and 7, with respect to the "Neutral" mark, but not Counts 8 and 9. Id.

C.  Rymed's trademark registrations

Rymed holds Trademark Registration No. 3,168,566 on the Principal Register for the term "Neutral" in connection with "medical apparatus for use in performing intravenous procedures, namely, tubing connectors and valves for use in the collection and distribution of blood and intravenous fluids" in Class 10 (medical apparatus).  Rymed filed for this trademark protection in the U.S. Patent and Trademark Office ("U.S.P.T.O.") on December 22, 2005, representing its first use and first use in commerce as December 1, 2005.  ICU filed a petition for cancellation of Rymed's "Neutral" registered mark in the U.S.P.T.O. on November 6, 2007.  The proceedings were stayed on April 2, 2008 by the Trademark Trial and Appeal Board, pending the outcome of this case.

At the same time as the application for "Neutral," Rymed filed an application for the term "Neutral Displacement" in connection with the same goods and in the same class as the "Neutral" term, but the first use and first use in commerce of the mark were represented to be January 1, 2004.[3]  The examining attorney at the U.S.P.T.O. refused the application for registration, on the grounds that the term was "merely descriptive of the identified goods" and that Rymed was "not the only user of this term ["Neutral Displacement"] to describe medical valves," citing ICU's MicroClave marketing material.  Rymed amended its application to apply for registration on the Supplemental Register, rather than the Principal Register.  Rymed received Trademark Registration No. 3,337,575 on the Supplemental Register on November 13, 2007.

The central dispute in this summary judgment centers around whether "neutral" and "neutral displacement" are generic terms to describe features of needleless connectors or are protectable as trademarks.

---

[3] Rymed, in this suit, asserts that the first sale for clinical use of the "InVision-Plus® Neutral® Intraluminal Protection System" was in April 2004, which was *after* its application for U.S. Patent No. 6,994,315.

1

2  **II. Analysis**

3      A. Legal Standard for Summary Judgment

4      Summary judgment is appropriate "if the pleadings, the discovery and

5  disclosure materials on file, and any affidavits show that there is no genuine issue

6  as to any material fact and that the movant is entitled to judgment as a matter of

7  law." Fed. R. Civ. P. 56(c). In this inquiry, "[t]he evidence of the non-movant is

8  to be believed, and all justifiable inferences are to be drawn in his favor."

9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, for the non-

10 moving party to prevail, there must be evidence sufficient to allow a reasonable

11 jury to return a verdict in favor of the non-moving party. *Id*. at 248.

12     Summary judgment also "necessarily implicates the substantive evidentiary

13 standard of proof that would apply at trial on the merits." *See Anderson*, 477 U.S.

14 at 252-255 ("Whether a jury could reasonably find for either party . . . cannot be

15 defined except by the criteria governing what evidence would enable the jury to

16 find for either the plaintiff or the defendant . . . ."). The burden of the moving

17 party is "to show initially the absence of a genuine issue concerning any material

18 fact." *Celotex Corp. v. Catrett*, 477 U.S. 316, 325 (U.S. 1986). The non-moving

19 party must then "go beyond the pleadings" and designate "specific facts showing

20 that there is a genuine issue for trial." *Id*. at 324.

21     B. Trademark validity

22         1. Legal standard

23     The purpose of a trademark is to identify and distinguish the goods or

24 services of one party from those of another party. 15 U.S.C. § 1127. The Lanham

25 Act makes "actionable the deceptive and misleading use of marks" and "protect[s]

26 persons ... against unfair competition." *Id*. A trademark is defined as including

27 "any word, name, symbol, or device, or any combination thereof" used by a person

28 "to identify and distinguish his or her goods, including a unique product, from

-4-

1    those manufactured or sold by others and to indicate the source of the goods, even
2    if that source is unknown." *Id.*

3           Cases generally identify four categories of marks, in ascending levels of
4    strength, they are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or
5    fanciful, although "the lines of demarcation are not always clear." *Surgicenters of*
6    *Am. v. Med. Dental Surgeries*, 601 F.2d 1011, 1014 (9th Cir. 1979). A "'generic'
7    term is one that refers, or has come to be understood as referring, to the genus of
8    which the particular product or service is a species" and "cannot become a
9    trademark under any circumstances." *Id.* (citing *Abercrombie & Fitch Co. v.*
10   *Hunting World, Inc.*, 537 F.2d 4, 9-10 (2nd Cir. 1976)). "A merely 'descriptive'
11   term specifically describes a characteristic or ingredient of an article or service"
12   and can become a valid trademark by "acquiring a secondary meaning, i.e.,
13   becoming 'distinctive of the applicant's goods.'" *Id.* "A 'suggestive' term
14   suggests rather than describes an ingredient, quality, or characteristic of the goods
15   and requires imagination, thought, and perception to determine the nature of the
16   goods" and therefore does not require proof of secondary meaning to be registered
17   as a trademark. *Id.* at 1014-15. "An 'arbitrary or fanciful' term is usually applied
18   to words invented solely for their use as trademarks" and may be registered as a
19   trademark without proof of secondary meaning, i.e., "without the need of debating
20   whether the term is 'merely descriptive'" and also "with ease of establishing
21   infringement." *Id.* at 1015.

22          In a trademark infringement action, the plaintiff bears the ultimate burden
23   of persuasion, that is, proof of infringement. *Tie Tech, Inc. v. Kinedyne Corp.*, 296
24   F.3d 778, 783 (9th Cir. 2002). The validity of the trademark is of course "a
25   threshold issue," as there can be no infringement of an invalid mark. *Id.*

26          Federal registration is *prima facie* evidence of the validity of the mark. 15
27   U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal
28   register provided by this chapter shall be prima facie evidence of the validity of the

-5-

1 registered mark and of the registration of the mark, of the registrant's ownership of

2 the mark, and of the registrant's exclusive right to use the registered mark"). Thus,

3 for registered marks, a defendant may rebut the presumption of validity, "by a

4 showing by a preponderance of the evidence that the term was or has become

5 generic." *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.*, 684 F.2d 1316,

6 1319 (9th Cir. 1982). When a mark is not registered, there is no presumption of

7 validity, and "the plaintiff is left with the task of satisfying its burden of proof of

8 establishing a valid mark absent application of the presumption." *Yellow Cab Co.*

9 *v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).

10      If a plaintiff meets its burden of proving that he has a valid mark, he must

11 also prove that "the defendant's use of the same or similar mark would create a

12 likelihood of consumer confusion" to maintain an action for trademark

13 infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. §

14 1125(a), and unfair competition under California law. *Murray v. Cable Nat'l*

15 *Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir. 1996).

16      Summary judgment is proper when there is no trademark protection.

17 *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147

18 (9th Cir. 1999) (affirming summary judgment of finding "Filipino Yellow Pages" a

19 generic term and dismissing trademark infringement, false designation of origin,

20 unfair competition and other claims). In actions involving registered marks,

21 courts may determine the right to registration, and cancel registrations, in whole or

22 in part. 15 U.S.C. § 1119. *See also Informix Software, Inc. v. Oracle Corp.*, 927

23 F. Supp. 1283 (N.D. Cal. 1996) (discussing concurrent jurisdiction of a federal

24 court and the Trademark Trial and Appeal Board over cancellation of trademarks).

25      2. Rymed's marks

26      ICU asserts that Rymed's marks "Neutral" and "Neutral Displacement" are

27 generic terms, or at most, merely descriptive marks without secondary meaning.

28 Mem. of P. & A.'s in Support of Mot. for Partial Summ. J. of "Neutral" False

1   Advertising and Trademark Claims ("ICU's P. & A.'s") at 17.  ICU must present
2   facts to show by a preponderance of the evidence that Rymed's marks are generic
3   to overcome the presumption of validity of the registered mark.

4        To determine whether a mark is generic, the Ninth Circuit has endorsed the
5   "'who-are-you/what-are-you' test." *Filipino Yellow Pages*, 198 F.3d at 1147.  "'A
6   mark answers the buyer's questions 'Who are you?' 'Where do you come from?'
7   'Who vouches for you?' But the [generic] name of the product answers the
8   question 'What are you?'" *Filipino Yellow Pages*, 198 F.3d (citing *Official Airline*
9   *Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting 1 J. McCarthy,
10  *Trademarks and Unfair Competition* § 12.01 (3d ed. 1992)).  Under the "who-are-
11  you/what-are-you" test, "[i]f the primary significance of the trademark is to
12  describe the type of product rather than the producer, the trademark [is] a generic
13  term and [cannot be] a valid trademark." (*Id.* at 1147 quoting *Anti-Monopoly, Inc.*
14  *v. General Mills Fun Group*, 611 F.2d 296, 304 (9th Cir. 1979)).  For a
15  determination of genericness, the crucial date is the date the alleged infringer
16  entered the market with the disputed mark or term.  *Yellow Cab*, 419 F.3d at 928.
17  The test for genericness depends on the "primary significance of the registered
18  mark to the relevant public."  15 U.S.C. § 1064(3).  Evidence to prove genericness
19  can be varied, and may include plaintiff's use, competitors' use, dictionary
20  definitions, media usage, testimony of people in the trade, and consumer surveys.
21  2 J. McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed. 2009).  *See*
22  *also Filipino Yellow Pages*, 198 F.3d at 1145.

23       Marks that are descriptive can be protected as valid trademarks with a
24  showing of secondary meaning. *Filipino Yellow Pages*, 198 F.3d at 1151 (citing
25  *Surgicenters of Am.*, 601 F.2d at 1014).  Secondary meaning has "attached" to a
26  mark when "the consuming public connects the mark with the producer rather than
27  the product." *Surgicenters*, 601 F.2d at 1018 (citing *Carter-Wallace, Inc. v.*
28  *Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970)).

1    Courts may look to the use of a mark by the trademark holder itself as well

2  as others to determine genericness. *Colt Defense LLC v. Bushmaster Firearms,*

3  *Inc.*, 486 F.3d 701, 707 (1st Cir. 2007). "Generic use by the party seeking

4  trademark protection is relevant because '[a] kind of estoppel arises when the

5  proponent of [a] trademark use is proven to have itself used the term before the

6  public as a generic name . . . .'" *Id.* (citing McCarthy § 12:13) (alterations in

7  original). *See also CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019,

8  1029 (N.D. Cal. 2008).

9    a. Rymed's use of the terms

10    Rymed filed a patent application for a "Swabbable Needle-Free Injection

11  Port Valve System with Neutral Fluid Displacement," now U.S. Patent No.

12  6,994,315 ("the Rymed patent"), on January 13, 2004, before its filing of the

13  trademark applications for marks "Neutral" and "Neutral Displacement." Rymed

14  used the word "neutral" within the term "neutral fluid displacement" throughout

15  the specification and in prosecution arguments.

16    The application recites the word "neutral" within the term "neutral fluid

17  displacement in the title and written description generically five times, and in the

18  claims three times. *See* the Rymed patent: title, col. 2, lines 42-45 ("It is another

19  object of the invention to provide an injection port valve system which has a

20  *neutral fluid displacement* to minimize blood being refluxed or retrograded into a

21  vascular access device lumen..."), col. 3, lines 58-59 ("The system achieves a

22  *neutral fluid displacement* and an improved microbial ingress barrier."), col. 8,

23  lines 39-43 ("This new design eliminates any interstitial cavity chamber or dead

24  space between these two interfaces thus assisting in achieving a '*neutral fluid*

25  *displacement*' when the valve is moved from the decompressed state to the

26  compressed state."), and col. 9, lines 6-11 ("assisting in eliminating the dead space

27  between the septum/boot valve and boot valve/spike tip interfaces to achieve

28  *neutral fluid displacement* during the compression and decompression cycle.")

-8-

(emphases added). Three claims of the Rymed patent recite the limitation as well: claim 16 ("said second connector forces said second resilient barrier and said tip portion of said first resilient barrier over said spike with *neutral fluid displacement* and such that said second connector and said first connector are in fluid communication with each other"), claim 28 ("such that the valve is opened putting the device is in fluid communication with the fluid pathway with *neutral fluid displacement* during coupling," and claim 29 ("such that the device is no longer in fluid communication with the fluid pathway with *neutral fluid displacement* during uncoupling.). The Rymed patent; col. 12, lines 61-66; col. 15, lines 20-23; and col. 15, line 27 to col. 16, line 2 (emphases added).

While prosecuting the Rymed patent, Rymed used the neutral displacement feature to overcome a rejection under 35 U.S.C. § 102(b) over its own prior patent. To distinguish the claims from the prior art, Rymed characterized neutral fluid displacement as "arguably the most important improvement over this inventor's prior apparatus which provided 'low reflux' but not 'neutral fluid displacement'." Reply to Office Action dated Aug. 26, 2005 in Serial No. 10/756,601, at 18. Rymed continued, "It wasn't until the presently disclosed and claimed invention that it was possible to provide completely neutral displacement, i.e.[,] absolutely no reflux, a significant improvement" and offered to provide customer testimonials to demonstrate that "the neutral (zero) fluid displacement is being heralded throughout the U.S. at hospitals and by nursing associations as a significant achievement which eliminates the need for heparin flushes." *Id.*

The patent examiner allowed the claims, but amended claim 17 (which issued as claim 16) to also include the limitation of "with neutral fluid displacement" to "overcome potential prior art rejections." Examiner's Amendment dated Sept. 20, 2005 in Serial No. 10/756,601, at 2. Rymed did not comment on the examiner's amendments.

1   While trademarks may be used in patent applications, they "should be

2   identified by capitalizing each letter of the mark (in the case of word or letter

3   marks) or otherwise indicating the description of the mark" such as following the

4   mark with [trade] or ®, and "be accompanied by the generic terminology."

5   Manual of Patent Examining Procedure ("M.P.E.P.") § 608.01(v).  In addition, the

6   M.P.E.P. counsels "[a]lthough the use of trademarks is permissible in patent

7   applications, the proprietary nature of the marks should be respected and every

8   effort made to prevent their use in any manner which might adversely affect their

9   validity as trademarks" and counsels against the use of trademarks in the titles of

10  patent applications.  *Id.*

11  Rymed's use of the term "neutral fluid displacement" in the Rymed patent

12  and prosecution history are inconsistent with its assertion that the marks "Neutral"

13  and "Neutral Displacement" are protectable as trademarks.  There is no indication

14  that Rymed intends these terms to be trademarks in the Rymed patent as filed, and

15  there is no generic terminology other than "neutral" to describe the type of fluid

16  displacement.  In fact, it was not until Rymed had to rely on the neutral fluid

17  displacement feature for patentability that it even discussed the feature with words

18  other than neutral fluid displacement.

19  Rymed, in its online video presentation "Neutral Fluid Displacement and

20  Ease of Use," used the terms "neutral" and "neutral fluid displacement"

21  generically.  Kohut Decl., Ex. 59.  Before introducing its product, Rymed's

22  presentation describes the field of needlefree connectors, stating, "it is widely

23  believed that there are three types of Needle-Free IV Connector Systems as it

24  pertains to blood reflux: Neutral, Positive and Neutral.  Actually, there are only

25  two types: Negative or Neutral." *Id.*  Rymed described how its needlefree

26  connector works "on the principle of neutral fluid displacement" and refers to the

27  InVision Plus connector as having a "neutral feature" and "neutral technology."

28  *Id.*  Similarly, in marketing material for the "InVision-Plus® Neutral™ I.V.

Connector System," Rymed characterizes the system as "the original and patented neutral fluid displacement connector system." Kohut Decl. Ex. 71. Additionally, Rymed's CEO Dana Ryan discussed the "'clinical advantages' of 'Neutral Fluid Displacement'" and described the "'Neutral' displacement feature" in an email to a physician. Supp. Decl. of Laura L. Kohut in Supp. of Reply Mot. by ICU Medical for Partial Summ. J. of "Neutral" False Advertising and Trademark Claims at Ex. 13.

In February 2009, well after this case was underway, Rymed sought to clarify the use of the term "neutral" to its own sales force, by stating "*The Neutral® is Rymed's product. ... How do you define 'neutral?' The Neutral is what our product is called. It is not defined as anything and doesn't mean anything other than our product name. Zero displacement is a feature of The Neutral® and the MicroClave® does not offer that. Clear?*" *Id*. at Ex. 14. Evidence that Rymed's sales force did not understand that the term "neutral" was part of the trademarked name of the products they sold further supports a finding of genericness.

None of these uses or explanations, other than in the product name "InVision-Plus® Neutral™ I.V. Connector System," are consistent with anything other than genericness.

### b. Others' use of the terms

ICU has provided evidence of others' use of the words "neutral" and "neutral displacement" in publications as evidence of the generic nature of these terms.

An analysis of needlefree valves was published by the ECRI Institute, a nonprofit organization that does evidence-based research in the medical field. In its 2008 evaluation entitled "Needleless Connectors," ECRI used the term "neutral fluid displacement" generically. Decl. of Alison D. Burcar in Supp. of Mot. by ICU Medical for Partial Summ. J. of "Neutral" False Advertising and Trademark

1  Claims ("Burcar Decl."), Ex. 4 ("Because both positive- and negative-reflux

2  devices have presented some concern in clinical practice, neutral fluid

3  displacement devices were introduced," "Instructions with neutral fluid

4  displacement devices generally allow clamping [upon connection and

5  disconnection]," describing "neutral reflux" as a modification to IV-access

6  technology to eliminate infections). In addition, the ECRI Institute tested the

7  amount of displacement in needlefree connectors and classified them as "Negative

8  Displacement," "Neutral Displacement," and "Positive Displacement." ICU's P. &

9  A.'s at 5. The Vygon Bionector, ICU MicroClave and Rymed Invision Plus were

10  each classified as "Neutral Displacement." *Id.*

11      ICU has provided examples of generic use of the terms at issue in the

12  medical literature as well. A 2006 medical journal article entitled "Technology of

13  Flushing Vascular Access Devices" defines the term "neutral displacement

14  needleless system," defining it as "not allow[ing] fluid to move in either direction

15  when tubing or a syringe is disconnected," and classified types of needleless

16  injection systems as "Negative-displacement Devices," "Positive-displacement

17  Devices," and "Neutral-displacement Devices." Burcar Decl., Ex. 9. Similarly, a

18  2006 article entitled "Heparin Locking for Central Venous Catheters" describes

19  prevention of intraluminal blood by catheter disconnection with "a positive or a

20  neutral needleless system," which it also describes as eliminating the need for

21  flushing techniques. *Id.* at Ex. 15. The Association for Vascular Access described

22  locking catheters with a "positive or neutral displacement device." *Id.* at Ex. 13.

23      Competitors of Rymed and ICU also use the word "neutral" in the field of

24  needlefree valves. For example, Vygon Corporation markets its Bionector device

25  as a "Capless, Self-Sealing, Needle-Free, Neutral Pressure I.V. Access Device"

26  and describes it in its 510(k) Summary as "a Male/Female Luer, neutral

27  displacement device." Decl. of Laura L. Kohut in Supp. of Mot. by ICU Medical

28

1  for Partial Summ. J. of "Neutral" False Advertising and Trademark Claims

2  ("Kohut Decl."), Ex. 14, 9.

3        In addition, Rymed has provided evidence of generic use of the term

4  "Neutral" by those in the field. Laura Hayes, a product implementation nurse, in

5  her deposition stated that she associates the brand name "Neutral" with the

6  InVision-Plus Neutral because "it's part of [the] name," but also stated that she

7  "tested the product and found it to be neutral," and uses the term "neutral"

8  "interchangeably with zero fluid displacement." Declaration of Sarah M. Jalali in

9  Supp. of Rymed Technologies, Inc.'s Opp. to ICU Medical, Inc.'s Mot. for Partial

10 Summ. J. ("Jalali Decl.") at Ex. 9. In response to a question regarding testing she

11 and her colleagues performed to determine the fluid displacement of needleless

12 connectors, she stated "Yes, it was [neutral] — I'm using these terms

13 interchangeably again, neutral, no reflux or zero displacement." *Id*. Hayes'

14 testimony demonstrates that she uses the term "neutral" generically to describe a

15 feature of needleless connectors. Similarly, Rymed provides evidence of the

16 understanding of the term "Neutral" to be functional in the deposition testimony of

17 Kenneth Knighten, a former ICU product specialist. *Id*. at Ex. 3. In response to a

18 question regarding whether ICU marketed the MicroClave connector in sales

19 materials as neutral or not, Knighten replied "No. Neutral is just part of just the

20 function." *Id*. Rather than support Rymed's position that such uses cause product

21 source confusion between ICU and Rymed, this evidence of "neutral" as a

22 characteristic supports the finding of "neutral" as a generic mark. Rymed has not

23 adequately rebutted this evidence.

24              3. Genericness of Rymed's marks

25       When applying the "who-are-you/what-are-you" test for

26 genericness articulated in *Filipino Yellow Pages*, it is clear that "neutral," "neutral

27 displacement," and "neutral fluid displacement" answer the question "what-are-

28 you?" 198 F.3d at 1147. All of the evidence demonstrates that primary

-13-

1    significance of the terms is to describe a feature of needleless connectors. Rymed
2    emphasizes the neutral fluid displacement feature as the point of improvement over
3    the prior art to receive a patent on its needlefree injection system, and marketed its
4    product as having "neutral technology" and a "neutral feature." Rymed's
5    competitors, other third parties, and evidently its own sales force also referred to
6    "neutral displacement" and "neutral" as features of needleless connectors, just as
7    the terms "positive" and "negative" identify fluid displacement features of
8    connectors. The primary purpose of the terms at issue with respect to needleless
9    connectors is to identify the type of fluid displacement the connector has, and not
10    the source of the product. In other words, "neutral displacement" and "neutral" do
11    not answer the question "who-are-you?," but rather, "what-are-you?"

12    Rymed, relying on *Horizon Mills*, states "In order to find 'neutral' generic,
13    the Court has to find that a majority of the relevant buying public . . . do not view
14    'neutral' as a Rymed brand name and they only view it as a thing—as a generic
15    thing." Hr'g Tr. at 26 (citing *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d.
16    208 S.D.N.Y. 2001)). But this case is unlike *Horizon Mills* because there is no
17    allegation of "genericide" due to "a seller establish[ing] trademark rights in a term
18    which a majority of the relevant public *then* appropriates as the name of a
19    product." 161 F. Supp. 2d. at 213-24 (emphasis added). Here, no trademark rights
20    were established, and the test that Rymed attempts to apply is therefore
21    inappropriate. On the contrary, this is a case where "a seller appropriates an
22    existing generic term and claims exclusive rights in it as a 'trademark' of that
23    term." *Id*. at 213.

24    The Court finds that there is no dispute of material fact that the terms
25    "neutral" and "neutral displacement" are generic. Evidence of Rymed's use of the
26    terms in connection with marketing materials and the Rymed patent, as well as
27    others' use of the terms clearly demonstrate that the marks are generic. ICU has
28

1    therefore provided sufficient evidence to overcome the presumption of validity

2    created by the registrations of the marks.

3                    4. Suggestiveness of Rymed's marks

4        Rymed asserts that "Neutral" is a suggestive mark. Rymed's Opp. at 15. A

5    suggestive mark "requires a mental leap from the mark to the product." *Brookfield*

6    *Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1058

7    (9th Cir. 1999). Suggestive marks are entitled to trademark protection without a

8    showing of secondary meaning. *Surgicenters*, 601 F.2d at 1014-15.

9        Rymed takes the position that a mental leap is required to go from the word

10   "Neutral" to the concept of zero fluid displacement. Rymed's Opp. at 16.

11   Its proffered expert, Dr. Geoffrey D. Nunberg, a linguistics scholar, points to the

12   fact that "neutral fluid displacement" and "neutral displacement" as Google

13   Scholar search terms produce relatively few hits. Decl. of Dr. Geoffrey D.

14   Nunberg in Supp. of Ptf. Rymed Technologies, Inc.'s Opp. to M. for Summ. J. at

15   5-6. He goes on to assert that competitors do not need the term "neutral

16   displacement ... since there exists an alternative in *zero displacement* which

17   conveys the relevant property more directly and more accurately, and which is in

18   fact in more common use." *Id*. at 6. But this position conflicts with the fact that

19   Rymed used the term "Neutral" (within "Neutral Fluid Displacement") in the

20   Rymed patent eight times to describe zero fluid displacement connectors, and did

21   not once use the term "zero displacement." *See* § B(2)(a) *supra*.

22       Dr. Nunberg makes the analogy to investment returns: "an investment that

23   returns nothing isn't usually described as having a 'neutral return," but rather a

24   'zero return' – that is, it returns nothing." *Id*. at 6. Dr. Nunberg does not explain

25   why that analogy is appropriate, yet the analogy of the term neutral "used in

26   physics to refer to a particle or system that has no electrical charge – i.e., is neither

27   positively nor negatively charged," i.e., neutron with respect to proton and

28   electron, is "semantic coercion" and "literally incongruous in this context." *Id*.

1    If it is true, as Dr. Nunberg asserts, that "*neutral* and *neutral displacement*
2  could not literally describe a connector system in which no fluid is displaced on
3  connection or disconnection," and "must be worked out through an inferential
4  chain of some complexity (informally, a 'multi-stage reasoning process,' …)," and
5  has only "acquire[d] an after-the fact plausibility," then the Rymed patent would
6  likely have some enablement issues, since the neutral fluid displacement feature
7  was a point of novelty of the claimed invention, and not described with any other
8  term. *Id*. at 7; *see* § B(2)(a) *supra*.

9    Here, where the defendant has rebutted the presumption of validity of a
10 registered mark by a preponderance of the evidence, the plaintiff must satisfy the
11 burden of proof of showing it has a valid mark. *Yellow Cab*, 419 F.3d at 928.
12 The evidence provided by Rymed is insufficient to meet its burden of proof, and
13 the Court finds the terms at issue to be generic terms, rather than suggestive marks
14 or descriptive marks with secondary meaning, for the reasons articulated above.
15 *See* § II(B)(3) *supra*.

16                  5. Secondary meaning

17    Rymed argues in the alternative that "neutral" and "neutral displacement"
18 are descriptive marks with secondary meaning, and thus are entitled to protection.

19    Secondary meaning is a fact question, and may be proven with evidence of
20 "(1) whether actual purchasers of the product bearing the claimed trademark
21 associate the trademark with the producer, (2) the degree and manner of
22 advertising under the claimed trademark, (3) the length and manner of use of the
23 claimed trademark, and (4) whether use of the claimed trademark has been
24 exclusive." *Yellow Cab*, 419 F.3d at 930 (quoting *Levi Strauss & Co. v. Blue Bell*,
25 *Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985)). Compound words, "which could not
26 individually become a trademark may become one when taken together" if
27 secondary meaning has attached. *Surgicenters of Am.*, 601 F.2d at 1017 (citing
28 *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir)).

1    Rymed offers as proof of secondary meaning evidence of sales and

2  marketing figures of the "InVision-Plus® Neutral® Intraluminal Protection

3  System." Rymed's Opp. at 19. In addition, it offers evidence to show it was the

4  only company using "Neutral" or "Neutral Displacement" as a trademark. *Id.* at

5  20.

6    Actual confusion and a likelihood of confusion also may be used as evidence

7  of secondary meaning. *See, e.g., Surgicenters of Am.*, 601 F.2d at 1018. Here,

8  there is no evidence to suggest a likelihood of or any actual consumer confusion as

9  to the origin of ICU's connector, marketed as the "MicroClave® Neutral

10  Displacement Connector," which begins with ICU's trademark "MicroClave."

11  Rymed's connector, the "InVision-Plus® Neutral®," is also marketed with two

12  terms: Rymed's trademark followed by the term "neutral."

13    The sparse evidence presented is insufficient to establish secondary meaning

14  for the terms by a preponderance of the evidence. *See generally E. & J. Gallo*

15  *Winery v. Pasatiempos Gallo, S.A.*, 905 F Supp. 1403, 1415 (E.D. Cal 1994);

16  *Lewis Management Co. v. Corel Corp.*, 26 U.S.P.Q.2d 1534, 1538 (S.D. Cal 1995).

17  Additionally, the Court notes that Rymed has offered no evidence to demonstrate

18  how much of the secondary meaning purports to be attributed to the "Neutral"

19  mark as opposed to the "InVision-Plus" mark.

20    Thus, Rymed has not met its burden of showing secondary meaning to prove

21  that it has valid marks.

22    C. Trademark infringement claims

23    In a trademark infringement action under 15 U.S.C. § 1114, an infringing

24  use must be "likely to cause confusion, or to cause mistake, or to deceive" and the

25  outcome often turns on whether or not defendant's use of the same or similar mark

26  would create a likelihood of consumer confusion as to the origin of the goods or

27  services. *See, e.g., Murphy*, 86 F.3d at 860. Courts often rely on the eight factor

28

1 | test set forth in *Sleekcraft* to guide the determination. *AMF Inc. v. Sleekcraft*
2 | *Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

3 | In this case, however, Rymed does not allege that consumers are confused as
4 | to the origin or source of ICU's accused infringing products. Rymed admits that
5 | ICU marks its products with its own "MicroClave" trademark in addition to the
6 | term "neutral," stating, "ICU currently refers to this product as its MicroClave
7 | Neutral Displacement Connector." Rymed's Opp. at 5.

8 | Rymed takes a careful position with respect to the term "neutral." Rymed
9 | argues that the term "Neutral" is its trademark, and identifies its "InVision-Plus®
10 | Neutral®" product, which in turn, is associated with particular performance
11 | characteristics, i.e., zero fluid displacement. Rymed's Opp. at 10. Thus, Rymed
12 | argues that ICU's use of the term "Neutral" misleads or confuses consumers into
13 | thinking that ICU's MicroClave connector has zero fluid displacement like the
14 | InVision-Plus connector, and provides evidence to support the position that the
15 | MicroClave connector does not have zero fluid displacement. *Id.* at 10-12. Rymed
16 | is careful not to explicitly articulate that the term neutral means zero displacement.
17 | *Id.* at 10.

18 | Rymed, with its contorted argument, has not alleged any facts or provided
19 | any evidence that consumers are likely to be confused, mistaken, or deceived as to
20 | the source of ICU's products. Further, this Court finds that Rymed does not have
21 | any trademark rights in the terms "neutral" and "neutral displacement." *See supra*,
22 | § II(B)(3). Thus, there is no genuine issue of material fact and summary judgment
23 | of the trademark infringement claims is appropriate.

24 | D.  False advertising claims

25 | Rymed also alleges that ICU's use of the term "neutral" in marketing the
26 | "MicroClave Neutral Displacement Connector," and its representation that the
27 | MicroClave connector is neutral, are false or misleading. Rymed's First Am.
28 | Compl. at ¶53.

1     The elements of a false advertising claim under the Lanham Act § 43(a) are:
2  (1) a false statement of fact by in a commercial advertisement about its own or
3  another's product, (2) the statement actually deceived or has the tendency to
4  deceive a substantial segment of its audience, (3) the deception is material, in that
5  it is likely to influence the purchasing decision, (4) the defendant caused its false
6  statement to enter interstate commerce, and (5) the plaintiff has been or is likely to
7  be injured as a result of the false statement, either by direct diversion of sales from
8  itself to defendant or by a lessening of the goodwill associated with its products.
9  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).
10     In the absence of trademark protection for the term "neutral," there can be
11  no false advertising claim. Rymed therefore can not meet the deception element of
12  the claim for false advertising, which is predicated on ICU's use of the term
13  "neutral" causing consumers to be confused and misled.
14     In addition, Rymed can not meet the false statement of fact element of the
15  test because it does not argue that the term "neutral" means "zero fluid
16  displacement," and ICU's connector does not produce zero fluid displacement,
17  making its use of the word "neutral" a falsity. Whether or not ICU's connector
18  product shares the same fluid displacement characteristics as Rymed's connector
19  product is therefore not important.
20     Summary judgment on the false advertising claims with respect to ICU's use
21  of the term "neutral" is appropriate, since there is no genuine issue of material fact
22  that Rymed cannot establish such a claim.
23
24  **III. Conclusion**
25     There is no dispute of material fact that that the terms "neutral" and "neutral
26  displacement" are generic terms. They are not descriptive marks or suggestive
27  marks with secondary meaning. Rymed itself used the term "neutral" generically
28  in its patent application before its first use in commerce and before its application

for trademark protection. In addition, Rymed has not provided any evidence of secondary meaning, and its argument that the term "neutral" is a suggestive mark is unconvincing.

Because the Court has found the terms "neutral" and "neutral displacement" to be generic, there can be no trademark protection for these terms. Accordingly, there can be no federal or state trademark infringement, false advertising, false designation of origin, unfair competition, or common law passing off involving the use of these terms. Rymed has not created any triable issues of fact.

Therefore, ICU's Motion for Partial Summary Judgment is GRANTED for Counts 1 to 7 for the trademark infringement and false advertising claims with respect to the term "neutral."

Rymed's evidentiary objections are DENIED.

ICU's evidentiary objection is GRANTED because the details of the experiments are not sufficiently described to deem the methods reliable.

IT IS SO ORDERED.

DATED: April 22, 2009

Hon. Mariana R. Pfaelzer
United States District Judge